[Cite as *In re A.R.*, 2023-Ohio-390.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| IN RE: A.R. | : |
| | : |
| | : |
| | :   C.A. No. 29604 |
| | : |
| | :   Trial Court Case No. G-2020-003998- |
| | :   0C,0F |
| | : |
| | :   (Appeal from Common Pleas Court- |
| | :   Juvenile Division) |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on February 10, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by RICKY L. MURRAY, Attorney for Appellee

ROBERT ALAN BRENNER, Attorney for Appellant

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} D.R., the biological mother of A.R., appeals from a judgment granting permanent custody of A.R. to Montgomery County Children's Services ("MCCS").[1] D.R. contends that the trial court erred in finding that it was in the best interest of A.R. for

---

[1] To protect the identify and privacy of a minor child, we will refer to the child and her biological mother by their initials.

permanent custody to be granted to MCCS. For the reasons that follow, we affirm the trial court's judgment.

I.      Facts and Course of Proceedings

{¶ 2} On October 30, 2020, MCCS filed an abuse and dependency complaint in the Montgomery County Court of Common Pleas, Juvenile Division. According to the complaint, A.R. was born at Kettering Medical Center on August 3, 2020. She tested positive for fentanyl, methamphetamine, amphetamine, and alprazolam. D.R. tested positive for amphetamines and benzodiazepine at the time of A.R.'s birth. A.R. suffered severe withdrawal symptoms and was transferred to Dayton Children's Hospital for treatment. A.R. remained there until she was discharged to Brigid's Path on September 1, 2020. The complaint alleged that D.R. did not have income or housing and that she refused the agency's referral to Family Treatment Court. MCCS requested that the trial court adjudicate A.R. an abused and dependent child and grant a preferred disposition of temporary custody to MCCS.

{¶ 3} Following a hearing, the magistrate issued an interim order finding that MCCS was in the best position to provide for the health, safety, welfare, and overall well-being of A.R. The magistrate noted that the primary concerns with D.R. were issues relating to parenting, substance abuse, housing, and income. Interim custody was granted to MCCS. On January 8, 2021, the guardian ad litem filed her report with the court, recommending temporary custody to MCCS. On January 15, 2021, the magistrate granted temporary custody of A.R. to MCCS with an expiration date of October 30, 2021.

The magistrate noted that MCCS had filed D.R.'s case plan with the court.

{¶ 4} An initial adjudicatory hearing was held before the magistrate on September 29, 2021. Following the hearing, the magistrate issued an interim and final order. The magistrate found that MCCS had made reasonable efforts to implement a permanency plan. The magistrate reiterated the concerns relating to D.R.'s parenting, substance abuse, housing, and income.

{¶ 5} The magistrate held a custody hearing on January 11, 2022. Brooke L. ("Brooke"), A.R.'s foster mother, testified that she had been A.R.'s foster parent since November 2000. *Id.* at 10-11. When she and her husband first became A.R.'s foster parents, Brooke took a month off from work in order to bond with A.R. *Id.* at 21-22. Both foster parents were bonded with A.R. *Id.* at 22-23. Brooke's husband engaged in many outdoor activities with A.R. *Id.* They also had a younger foster daughter with whom A.R. had taken on the big sister role. *Id.* at 23-24. Brooke and her husband intended to adopt A.R. *Id.* at 26.

{¶ 6} When Brooke first became A.R.'s foster parent, there were concerns about drug exposure in utero and hepatitis C exposure. *Id.* at 11-12. Under Brooke's care and the Help Me Grow program, there are no longer any concerns about the previous drug and hepatitis C exposure. Indeed, A.R. is advanced in some areas and on track in other areas. *Id.* at 11-15. Brooke had taught A.R. some sign language and Spanish to help with communication. *Id.* at 25.

{¶ 7} Brooke had maintained a cordial relationship with D.R. *Id.* at 15. At the beginning of the foster parenting, D.R. was scheduled to visit with A.R. for two hours on

Mondays. Brooke characterized D.R.'s visits as sporadic. D.R. was sometimes early, late, or a no-show. *Id.* at 16-17, 29-30. The visits with D.R. were suspended permanently in April 2021 due to legal issues involving an outstanding warrant against D.R. *Id.* at 17. There had been no in-person visits or virtual contact between D.R. and A.R. since April 2021. D.R. had reached out 4-5 times since that time asking for photos of A.R. or asking how she was doing. *Id.* at 18-20. Brooke stated that if D.R. reached a healthy place in her life, she (Brooke) would want A.R. to know that she had a biological mother who loved her. *Id.* at 28-29. During the foster care, there had been no contact at all between A.R. and her alleged biological father. *Id.* at 21.

{¶ 8} Emily Thompson, A.R.'s ongoing caseworker at MCCS, testified that she received the referral involving A.R. and her biological mother in August 2020, when A.R. tested positive for drugs at birth. At that time, D.R. did not have stable housing, reliable income, or sufficient baby supplies. *Id.* at 34. A.R. was referred to Brigid's Path, which provided an opportunity for D.R. to bond with A.R. and receive drug treatment. But D.R. failed to remain in treatment, which led to MCCS's seeking a temporary custody order. *Id.* at 34-35.

{¶ 9} Thompson stayed in regular contact with D.R. following the temporary award of custody. *Id.* at 36-38. Thompson discussed D.R.'s case plan with her and gave her a copy of the plan. *Id.* at 39-40. The case plan objectives included the following: complete a substance use disorder assessment, complete a mental health assessment, follow the recommendations of both assessments, establish housing and income to meet A.R.'s basic needs, sign any releases of information that were needed, complete

parenting classes, visit with A.R., and have random drug screens.   *Id.*

{¶ 10} D.R. had opportunities to receive treatment through Project Cure and at treatment centers, but she did not complete these programs due to drug relapses.   *Id.* at 48-51. Thompson had been unable to verify any of D.R.'s alleged employment.   Further, D.R. had not found any stable housing, instead alternating between staying at her boyfriend's place or at her mother's.   *Id.* at 53-56.

{¶ 11} From September 2020 to April 2021, D.R.'s visitation with A.R. was sporadic, despite Thompson's calling her with a reminder the morning of the visits.   *Id.* at 58.   In March 2021, D.R. pled guilty to possession of heroin.   In April 2021, a capias was issued for D.R.'s arrest.   *Id.* at 41; State's Exhibits 1, 2.   D.R.'s visits were canceled while she had the outstanding warrant.   D.R. failed to resolve the warrant issue and ultimately was arrested a few months later.   *Id.* at 58-60.   Thompson stated that drug issues and the outstanding warrant were why D.R. did not visit A.R. between April and October 2021.   *Id.* at 62-63.   Since October 2021, D.R. had been participating in the MonDay program in prison.   Since beginning this six-month program, D.R. also had been participating in the court-required programs relating to employment and parenting.   *Id.* at 47, 74.   Thompson was concerned that D.R. would not be doing these programs if they were not court-ordered.   *Id.* at 82-83.

{¶ 12} D.R.'s family members were deemed inappropriate for placement of A.R. For example, D.R.'s maternal grandmother used illegal substances.   *Id.* at 67-69. Thompson did not believe D.R. had a significant bond with A.R.   On the other hand, Thompson believed that A.R. had bonded with her foster parents, as evidenced by A.R.'s

seeking comfort with Brooke and the smiling and eye contact. *Id.* at 80. According to Thompson, MCCS provided substitute care, home studies, information, and referrals to D.R. *Id.* at 70-71.

**{¶ 13}** Finally, D.R. testified at the hearing. As of the hearing date, she was focusing on remaining sober and getting her daughter back. *Id.* at 85-86. She believed she would be able to reunify with A.R. within six months of the hearing. D.R. stated that MCCS had never helped her obtain housing and that it had never been explained to her that she needed to be clean before MCCS would help with housing. *Id.* at 86. According to D.R., she had completed an employment readiness program in December 2021 and had started parenting classes, with an expected completion date of February 24, 2022. *Id.* at 87. She believed that A.R. had bonded with her, as evidenced by A.R.'s staring at her, grabbing her cheeks, and playing back and forth with D.R. *Id.* at 88. The last time D.R. had held A.R. was in April 2021. *Id.* at 96. D.R. blamed some missed scheduled visitation sessions on the foster mom's leaving before D.R. arrived. *Id.* at 89. However, she admitted that she had not had any transportation issues and arrived late for some of the canceled sessions. *Id.* at 98-99. D.R. had not used fentanyl since September 2021 but conceded that she had suffered relapses over the years. *Id.* at 91-95. D.R. believed she was addressing her problems and wanted to do whatever it took to get her daughter back. *Id.* at 90, 100.

**{¶ 14}** On February 2, 2022, following the dispositional hearing, the magistrate granted permanent custody of A.R. to MCCS and terminated legal custody of D.R. The biological parents of A.R. were divested of all parental rights, privileges, and obligations,

including all residual rights and obligations.

{¶ 15} On February 15, 2022, D.R. filed objections to the magistrate's decision. According to the objections, D.R. "was in case plan services and working towards reunification. The child had only been removed for about a year and two extensions were possible to permit reunification." On August 1, 2022, after the transcript of the January 11, 2022 hearing was completed, D.R. filed supplemental objections to the magistrate's February 2, 2022 decision and requested a hearing to submit additional evidence. D.R. contended that she was no longer incarcerated, was actively working on her case plan, and had maintained sobriety. She stated that, "[a]s two extensions of temporary custody were still available and mother is making progress, she would ask for the court to allow her that opportunity to reunify with her child."

{¶ 16} On September 1, 2022, the trial court overruled D.R.'s objections to the magistrate's decision, granted MCCS's motion for permanent custody of A.R., and terminated D.R.'s legal custody and parental rights, privileges, and obligations. D.R. filed a timely notice of appeal from the trial court's final order.

II.    The Trial Court Did Not Abuse Its Discretion in Terminating D.R.'s Parental Rights

{¶ 17} D.R.'s sole assignment of error states:

THE JUVENILE COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF THE CHILD TO [MCCS].

{¶ 18} We will not overturn a juvenile court's decision to terminate parental rights

"if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re Forrest S.*, 102 Ohio App.3d 338, 344-345, 657 N.E.2d 307 (6th Dist.1995). "We review the trial court's judgment for an abuse of discretion." *Id.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying an abuse of discretion standard to the trial court's findings under R.C. 2151.414).

{¶ 19} " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), quoting *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.*

{¶ 20} Further, "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Specifically, since "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.* However, this discretion, while broad, is "not absolute" and is guided by statutory language. *Id.*

{¶ 21} R.C. 2151.414 sets out specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 22. The court must find by clear and convincing evidence (1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1). " 'Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven. * * * An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof.' " (Citations omitted.) *In re A.L.*, 2d Dist. Montgomery No. 26772, 2016-Ohio-423, ¶ 52, quoting *In re Rishforth*, 2d Dist. Montgomery No. 20915, 2005-Ohio-5007, ¶ 11.

{¶ 22} D.R. contends that granting permanent custody of A.R. to MCCS was not in the best interest of A.R. Rather, D.R. believes an additional extension of temporary custody should have been granted instead. According to D.R., she would have been ready to reunite with A.R. within six months of the January 2022 hearing. Since D.R. limits her assignment of error to the issue of whether the trial court properly found that a grant of permanent custody to MCCS was in A.R.'s best interest, we will limit our review to this finding made by the trial court.

{¶ 23} In deciding a child's best interest, courts analyze factors set forth in R.C. 2151.414(D)(1)(a)-(e) and (E). These include, but are not limited to: "1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any

other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15, citing R.C. 2151.414(D).

{¶ 24} The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. There was no evidence presented at the hearing relating to these particular factors. Therefore, we will focus our review on the best interest factors enumerated in R.C. 2151.414(D)(1)(a)-(d).

{¶ 25} The trial court considered and analyzed each of the best interest factors set forth in R.C. 2151.414(D)(1). After summarizing the evidence presented by the parties at the hearing, the trial court concluded:

> After considering all relevant factors, the Court finds by clear and
> convincing evidence that permanent custody to the Agency is in the child's

best interest.

Mother has failed to address her Case Plan objectives and the alleged father has failed to establish paternity * * *. Mother was incarcerated at the time of the hearing and intended to enter into a sober living community upon release, however there was no information provided as to whether A.R. could be placed with Mother in this facility or if such a placement was proper for a young child.

Consequently, and unfortunately, neither parent is a suitable option for custody of the child. Further, the Court finds that there are no relatives or non-relatives able to care for the child. Finally, the Court finds that the child's most significant relationship is with the foster family, with whom she has lived since November 2020.

September 1, 2022 Decision, p. 11.

{¶ 26} The evidence presented at the custody hearing supported the trial court's findings. Brooke, A.R.'s foster mother, testified about how A.R. had bonded with her, her husband, and another foster child. Thompson, A.R.'s ongoing caseworker at MCCS, confirmed that this was the case. D.R., however, had not visited with A.R. since April 2021. Thompson stated that she did not believe D.R. had a significant bond with A.R. Further, the testimony presented at the hearing supported a finding that A.R. needed a legally secure permanent placement and that such a placement could not be achieved without a grant of permanent custody to the agency. Brooke and Thompson testified about how many chances D.R. had had to work on her case plan and visit with A.R. But

D.R. had several drug relapses and was unable to provide stable housing or show proof of consistent income. Also, D.R. did not take advantage of the resources or referrals provided by MCCS. D.R. did testify that since her time in prison, she had been working on some of the elements of her case plan. Thompson, however, was concerned that D.R. would not be completing certain programs if they had not been court-ordered.

{¶ 27} The record before us contains competent, credible evidence by which the trial court could have formed a firm belief or conviction that the grant of permanent custody to MCCS was in A.R.'s best interest. Therefore, the sole assignment of error is overruled.

III.     Conclusion

{¶ 28} Having overruled the assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


WELBAUM, P.J. and EPLEY, J., concur.